259 F.Supp.2d 922 (2003)
CINCINNATI INSURANCE COMPANY, Plaintiff,
v.
MERAMEC VALLEY BANK, Defendant.
No. 4:00-CV-206 CAS.
United States District Court, E.D. Missouri, Eastern Division.
February 10, 2003.
*924 Russell F. Watters, Brown and James, P.C., St. Louis, MO, for Plaintiff.
Michael A. Campbell, Christopher J. Rausch, Llynn K. White, Polsinelli and Shalton, St. Louis, MO, Dennis E. O, Senior Partner, Bryan Cave LLP, St. Louis, MO, for Defendant.

MEMORANDUM AND ORDER
SHAW, District Judge.
This diversity action for declaratory judgment is before the Court on the parties' cross motions for summary judgment. Cincinnati Insurance Co. (Cincinnati), and its insured, Meramec Valley Bank (Bank), disagree on whether two insurance policies issued by Cincinnati to the Bank provide coverage for the Bank's costs and liability arising out of litigation between the Bank and a creditor. The gravamen of the disagreement centers on whether the claimed coverage was for "property damage" as defined by either policy. For the reasons set for below, the Court concludes that no coverage is provided, and that Cincinnati is entitled to summary judgment on its claims and on the Bank's counterclaims.

I. BACKGROUND

The Insurance Policies
Cincinnati issued two insurance policies to the Bank, a Financial Institutions Policy and a Commercial Umbrella Liability Policy. Cincinnati does not dispute that the claimed losses fall within the policy periods. The Financial Institutions Policy contains several Parts, including a Building and Personal Property Coverage Part, and a Commercial General Liability Coverage Part. The Building and Personal Property Coverage Part covered "direct physical loss or damage to Covered Property at [the Bank's premises]." An endorsement to this Part, entitled Foreclosed Property Coverage Endorsement, provides, in pertinent part:

A. COVERAGE
1. We will pay for direct physical loss of or damage to Foreclosed Property caused by or resulting from any Covered Cause of Loss.
Foreclosed Property, as used in this Coverage Endorsement, means one or more of the following options for which a Limit of Insurance is shown in the Foreclosed Property Coverage Schedule or the Foreclosed Property Report of Values form:
a. 1- to 4-family dwelling building, or
b. Any other building
including personal property mortgaged in connection with the building, acquired through repossession, foreclosure, deed in lieu of foreclosure or as mortgagee in possession.
The Commercial General Liability Coverage Part, provides, in pertinent part:
COVERAGE A____ PROPERTY DAMAGE LIABILITY
1. Insuring Agreement.
a We will pay those sums that the insured becomes legally obligated to play *925 as damages because of ... "property damage" to which this insurance applies. We will have the right and duty to defend any "suit seeking those damages."
* * * * * *
b. This insurance applies to ... "property damage" only if:
(1) The... "property damage" is caused by an "occurrence" ....
* * * * * *

2. Exclusions
This insurance does not apply to:
a.... "property damage" expected or intended from the standpoint of the insured.
The Commercial General Liability Coverage Part contains a provision for Supplementary Payments agreeing to pay, with respect to any claim or suit Cincinnati defends, all reasonable expenses and costs. The Commercial General Liability Coverage Part contains the following definitions:
* * * * * *
"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
* * * * * *
"Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of the property. All such loss or use shall be deemed to occur at the time of the "occurrence" that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.
An endorsement to this Part, entitled Commercial General Liability Endorsement, provides, in pertinent part:

1. Foreclosed ... Property Coverage
This insurance applies to ... "property damage" ... arising out of:
a. Any property you acquire through repossession, foreclosure, deed in lieu of foreclosure or as mortgagee in possession;
The Commercial Umbrella Liability Policy contains the following provisions with regard to coverage:

A. WE WILL PAY
We will pay on behalf of the insured the ultimate net loss for occurrences during the policy period in excess of the underlying insurance or for occurrences covered by this policy which are either excluded or not covered by underlying insurance because of ... property damage ... anywhere in the world.
* * * * * *
C. OUR DUTIES AND YOURS IN CLAIMS OR SUITSDEFENSE, INVESTIGATION, SETTLEMENT, REIMBURSEMENT, ASSISTANCE AND COOPERATION
(a) With respect to such insurance as is afforded by this policy, if there is no underlying insurer obligated to do so, we shall have the right and duty to defend any suit against the Insured seeking damages on account of ... property damage ... even if any of the allegations of the suit are groundless, false or fraudulent and we may make such investigation and settlement of the any claim or suit as we deem expedient, but we shall not be obligated to defend any suit after the applicable limit of our liability had been exhausted.
We will pay, in addition to the applicable limit of liability ... [the costs of the litigation].
The Commercial Umbrella Liability Policy contains the following definitions:
* * * * * *

*926 G. "occurrence"means an accident, or happening or event, or a continuous or repeated exposure to conditions, which occurs during the policy period which unexpectedly or unintentionally results in .. . property damage .... All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.
* * * * * *
J. "property damage"means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

The Underlying Litigation
The Bank provided financial assistance to Joel Bianco and his motorcycle dealership, Joel Bianco Kawaski Plus, Inc., (jointly referred to herein as Bianco) through the grant of two loans and two letters of credit. The notes were secured by security agreements pledging Bianco equipment and inventory. In 1997, Bianco fell behind in its payments to the Bank and other creditors and sought to sell its business. The Bank decided not to wait to assert its claims and on October 3, 1997, filed suit in state court against Bianco seeking judgment on the notes and replevin of the secured property. The Bank obtained an Order of Replevin on the same day, and on October 6, 1997, without notice to Bianco, representatives of the sheriffs department came to the dealership and seized secured property.
The parties initiated immediate negotiations to forestall the replevin so that Bianco could complete the sale of the business. An agreement was reached that the replevin would cease and Bianco would provide additional collateral, but when negotiations for the sale of the business broke down two days later, the replevin continued. The business was ultimately sold, but not on favorable terms. On November 24, 1997, the Bank requested and received an interlocutory order of default in the replevin action.
Bianco blamed the Bank for the failure to sell the business prior to replevin and on December 10, 1997, filed a separate action against the Bank alleging, among other things, fraud in connection with the agreement to forestall the original replevin. Cincinnati provided a defense for the Bank. On March 4, 1999, default judgment was entered against Bianco in the replevin action and Bianco appealed. On November 19, 1999, while the appeal was pending, a jury returned a verdict against the Bank in the fraud action in the amount of $650,000. The Bank submitted a claim to Cincinnati seeking coverage for this judgment. The present action was commenced by Cincinnati on February 7, 2000, for a declaration that neither of the two insurance policies issued to the Bank covered this judgment.
Meanwhile, matters in the two state lawsuits proceeded. On March 28, 2000, the default judgment in the replevin case was set aside by the Missouri Court of Appeals and the case was remanded to the trial court. Meramec Valley Bank v. Joel Bianco Kawasaki Plus, Inc., 14 S.W.3d 684 (Mo.Ct.App.2000). On May 24, 2000, following the remand, Bianco filed a counterclaim in the replevin suit alleging that on October 6 and 8, 1997, incident to the replevin, the Bank deliberately took property in which it knew others had a superior security interest. Bianco alleged that it had been damaged in the amount of $525,000 as a result of this wrongful taking and sought damages in that amount.
*927 On October 31, 2001, the Missouri Court of Appeals vacated the judgment against the Bank in the fraud action, ruling that the trial court did not have jurisdiction because the fraud claim should have been filed as a compulsory counterclaim in the replevin action. The case was remanded for dismissal without prejudice. Joel Bianco Kawasaki Plus v. Meramec Valley Bank, 2001 WL 1001099 (Mo.Ct.App. Sept. 4, 2001). On December 18, 2001, the Missouri Supreme Court accepted transfer of the case.
On January 10, 2002, Cincinnati filed an amended complaint in the present action, seeking an additional declaration that no coverage exists under the two insurance policies at issue for the claims asserted in the May 2000 counterclaim in the replevin suit. The Bank filed a counterclaim for breach of contract and declaratory judgment. On August 27, 2002, the Missouri Supreme Court affirmed the fraud judgment against the Bank. Joel Bianco Kawasaki Plus v. Meramec Valley Bank, 81 S.W.3d 528 (2002) (en banc). The Court held that the Bank had waived its right to assert a compulsory-counterclaim defense by not raising it in a timely fashion, and that there was sufficient evidence to support the jury's verdict of fraud on the part of the Bank. Finally, on October 31, 2002, the parties dismissed the replevin action.

II. ARGUMENTS OF THE PARTIES
The Bank argues that the damages involved in both the fraud action and the counterclaim in the replevin action arose out of the replevin conducted by the Bank pursuant to an Order of Delivery, and thus arose out of an "occurrence." The Bank argues that its conduct does not fall under the exclusion in the Commercial General Liability Coverage Part related to property damage "expected or intended" from the Bank's standpoint. According to the Bank, the very fact that it obtained an Order of Delivery presupposes that the Bank expected or intended only to repossess the collateral for its loans. The Bank points out that, in any event, the Umbrella Policy does not contain such an exclusion. The Bank argues that coverage exists under the Foreclosed Property Coverage Endorsement, as well as under the Commercial General Liability Endorsement.
Cincinnati argues that the losses in question do not constitute property damage as a result of "an occurrence," as those terms are defined in both policies. The Foreclosed Property Coverage Endorsement only provides coverage for direct physical loss or damage to a building as a result of a covered cause of loss. The exclusion in the Commercial General Liability Part for injury which is "expected or intended from the standpoint of the insured," further operates to bar coverage under that policy for the judgment and counterclaim. The Commercial General Liability Coverage Endorsement likewise does not provide coverage in that the injuries in question do not "arise out of any property acquired through repossession or foreclosure."
Lastly, Cincinnati argues that even if there were coverage under the policies for the counterclaim in the replevin suit, the claim for punitive damages in the counterclaim would be excluded from coverage under both policies, as neither provides coverage for punitive damages.

III. LAW AND ANALYSIS
As the parties recognize, there are no genuine issues of material fact in dispute, only issues of law and contract interpretation, making this matter appropriate for summary judgment. See St. Paul Fire & Marine Ins. v. Lippincott, 287 F.3d 703, 705 (8th Cir.2002). Insurance policies are contracts, and so, as with any contract, the analysis begins with the language of the agreements, applying Missouri *928 law. Id. Missouri law dictates that clear and unambiguous language in an insurance policy should be given its plain meaning. Wood v. Safeco Ins. Co. of Am., 980 S.W.2d 43, 48 (Mo.Ct.App.1998); Killian v. Tharp, 919 S.W.2d 19, 21 (Mo.Ct. App.1996).
The Court first concludes that the Foreclosed Property Coverage Endorsement of the Financial Institutions Policy does not provide coverage for the fraud judgment because this endorsement only provides coverage for direct physical loss of or damage to a building (and personal property mortgaged in connection with the building) as a result of a covered cause of loss. The judgment did not constitute direct physical loss of or damage to a building or related personal property.
The Court next concludes that the Commercial General Liability Coverage Part of the Financial Institutions Policy does not provide coverage for the fraud judgment against the Bank because this judgment was not the result of "an occurrence," as that term is defined by the policy. Under Missouri law, when, as here, a liability policy defines "occurence" to mean "accident," injury caused by negligent misrepresentations of the insured are covered. See Wood, 980 S.W.2d at 48-49 (case of first impression). Injury caused by the insured's fraud, however, is a different matter. See Lampert v. State Farm Fire & Cas. Co., 85 S.W.3d 90, 95 (Mo.Ct.App.2002) (fraudulent misrepresentation claim, as opposed to negligent misrepresentation claim, is not an "occurrence"). Further, the fraud judgment is excluded from coverage under the exclusion in the Commercial General Liability Coverage Part, in that the injury was the result of intentional acts of the Bank and was thus "expected or intended from the standpoint of the insured." See id. (fraudulent misrepresentation claim, as opposed to negligent misrepresentation claim, is an intentional tort and therefore falls within a policy's "expected or intended" act exclusion).
The Bank's argument, advanced before the Missouri Supreme Court affirmed the fraud judgment, that the evidence at trial did not establish the Bank's fraudulent intent, is foreclosed by that decision. The Bank's argument that "[a]though a claim for fraudulent misrepresentation includes an element of intent, the resulting injury or damage was accidental," is without merit.
The Commercial General Liability Endorsement, which provides coverage for property damage "arising out of any property acquired through repossession or foreclosure," does not provide coverage here because the damage to Bianco for which the Bank seeks indemnification by Cincinnati did not "arise out of any property acquired through repossession or foreclosure, but rather arose out of the Bank's fraudulent conduct.
With regard to the counterclaim in the replevin suit, a liability insurer's duty to defend exists when the petition in the underlying action states some grounds of liability covered by the insurance policy. Butters v. City of Independence, 513 S.W.2d 418, 424 (Mo.1974). "The duty to defend is broader than the duty to indemnify.... If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." McCormack Baron Mgmt. Servs., Inc. v. American Guar. & Liab. Ins. Co., 989 S.W.2d 168, 170 (Mo. 1999) (en banc). Conversely, there is no duty to defend where the underlying claim is outside the coverage of the insurance policy. McDonough v. Liberty Mut. Ins. Co., 921 S.W.2d 90, 94 (Mo.Ct.App.1996).
The counterclaim alleges only deliberate and intentional misconduct on the *929 part of the Bank. The above reasoning with regard to the fraud judgment supports the conclusion that the counterclaim did not state any grounds of liability covered by either of the two insurance policies. Thus, Cincinnati did not have a duty under either policy to defend the Bank against the counterclaim or to indemnify the Bank for any liability associated with this counterclaim.

IV. CONCLUSION
Cincinnati is entitled to judgment as a matter of law on all claims and counterclaims.
Accordingly,
IT IS HEREBY ORDERED that Cincinnati Insurance Company's motion for summary judgment on its claims and on Meramec Valley Bank's counterclaims is GRANTED. [Doc. 53]
IT IS FURTHER ORDERED that Meramec Valley Bank's motion for summary judgment its counterclaims and on Cincinnati Insurance Company's claims is DENIED. [Doc. 61]
An appropriate Judgment shall accompany this Memorandum and Order.